# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# AT CHARLOTTESVILLE

| | |
|---|---|
| KAIA VICTORIA KRISTENSEN, a minor by next friend, SUSAN LEIGH KRISTENSEN, | ) ) ) ) |
| Plaintiff, | ) Case No.: 3:09CV00084 ) (consolidated with 3:09CV00085) |
| v. | ) ) |
| WILLIAM DAVID SPOTNITZ and DENISE CONSTANCE SCHAIN, | ) ) ) |
| Defendants. | ) ) |

## DEFENDANTS' REPLY TO PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION IN LIMINE TO EXCLUDE PLAINTIFFS' EXPERTS

COME NOW the defendants, William D. Spotnitz and Denise C. Schain, by counsel, and to reply to plaintiffs' memorandum in opposition to the defense motion to exclude plaintiffs' experts. In support of this reply, the Defendants state as follows:

**I.** **Dr. Leonard Vance's Opinions are Speculative and Do Not "Fit" the Facts of this Case**

Plaintiffs offer Dr. Vance to opine that there were "excessive" levels of mold in the subject home despite not disputing the fact that there are no national standards for safe levels of mold as it relates to a person's health. See page 7 of Plaintiffs' Memorandum in Opposition. To circumvent this "hole" in the available science, plaintiffs point to several articles for the proposition that visible mold is an unacceptable level. Plaintiffs point to two articles: Indoor Air Quality in Commercial and Institutional Buildings and Preventing Mold-Related problems in the Indoor Workplace, A Guide for Building Owners, Manager and Occupants. Neither of these articles states the conclusion offered by Dr. Vance. The first article provides how to prevent and

1

minimize indoor air quality issues and how to create and implement an air quality maintenance plan. Nowhere within the articles does it state that visible mold is an "excessive" level or that an "excessive" level will certainly cause any adverse health effects. Further, the latter article states that it is to be used to assess the "potential presence of observable mold and physical deficiencies' conducive to mold in connection with a property." See page 5. In other words, this article is intended to identify the potential for mold and the areas where mold may originate. Neither of these articles state that visible mold is considered excessive, but refer to visible mold as a marker to identify the source of a potential problem. These articles discuss visible mold for purposes of remediation, not for purposes of setting a threshold for purposes of human health and exposure. In effect, Dr. Vance has drawn a conclusion from scientific literature that is different than what is stated. Drawing improper conclusions from scientific literature strikes at the very heart of an opinion's reliability. See Hendrix v. Evenflo Co., 609 F.3d 1183, 1199 (11th Cir. Fla. 2010)(excluding expert opinion where medical literature did not support expert's theory of plaintiff's brain injury).

The plaintiffs' contention that visible mold is "excessive" is based upon an improper and unfounded premise. Simply because visible mold should be remediated does not mean that the level of mold would cause ill-health effects. The articles simply do not make that connection. This argument is nothing more than a comparison of apples and oranges. It is an irrelevant analogy, which is why his opinion is unreliable. Remediation is simply to, as plaintiffs contend, to eliminate "potential health hazards." See Page 7 of Plaintiffs' Memorandum in Opposition. Potential health hazards are not synonymous with known dangerous health levels.

In addition to relying upon irrelevant literature, Dr. Vance continues to refer to "excessive" levels of mold. According to the Merriam-Webster online dictionary, "excessive"

means "exceeding what is usual, proper, necessary, or normal." http://www.merriam-webster.com/dictionary/excessive. For a level of mold to be excessive, it must exceed that which is normal. Dr. Vance cannot point to any published data or literature defining how much mold is considered normal, abnormal, or excessive. In fact, he previously testified, in the parents' state court action, that "I'm not going to characterize the mold that was present as being a lot of mold or as not being a lot of mold" concerning the same house. Dr. Vance State Court Depo. at 37:7-9 attached hereto as Exhibit A. Yet now, he offers this opinion without any basis in fact or upon any generally accepted science. If he did, plaintiffs would surely bring the literature to this Court's attention. Even more telling is that plaintiffs do not dispute that there are no known harmful levels of mold which renders any mold testing meaningless. His opinion is unreliable and merely a conclusory opinion, and if admitted, would permit the jury to assume that the plaintiffs were exposed to "excessive" levels of mold, which is wholly unsupported.

Plaintiffs also offer Dr. Vance to testify that "general adverse health effects could result from such [mold] exposures." See page 15 of the Plaintiffs' Memorandum in Opposition. This statement, by definition, is speculative. By stating "could," the substance of the opinion means that there is a possibility that general adverse health effects could arise. Plaintiffs further want Dr. Vance to testify to a "scare list" of possible adverse health effects, such as "allergic reactions and immune responses (e.g. asthmas), infectious disease . . . and toxic effects . . . ." The admissibility of Dr. Vance's opinion would be similar to that of an accident reconstruction expert giving an opinion on possible spinal cord injuries resulting from a car accident. It is irrelevant and speculative.

Not only is Dr. Vance not qualified to give an opinion about what health effects are caused by mold exposure, but testifying to a litany of adverse health reactions does not "fit," or relevant to, the case at hand. Daubert v. Merrell Dow Pharms., 509 U.S. 579, 591 (1993).

**II.      Dr. Vilseck's Self-Created Methodology and Opinion is Unreliable, Unaccepted and Unproven**

A striking observation of the plaintiffs' opposition brief is the failure to address whether Dr. Vilseck's self-created methodology has been used or peer reviewed, had a known rate of error, or had standards to control its operation. Plaintiffs do counter, in part, that Dr. Vilseck's methodology need not have gained general acceptance within the medical community. To support this argument, the plaintiffs cite to Cavallo v. Star Enterprise for the proposition that "general acceptance" is no longer a requirement for admissibility. 100 F.3d 1150 (4th Cir. Va. 1996). However, the Cavallo court ruled that admissibility does not turn on "general acceptance," but it is still a factor to be considered in application of Daubert and Rule 702. Id. at 1159; see also Wehling v. Sandoz Pharms. Corp., 1998 U.S. App. LEXIS 38866, 8 (4th Cir. 1998).

The reason that the plaintiffs make this legal argument is because the facts, namely the literature, do not support their contentions. Plaintiffs extrapolate conclusions that mold caused their injuries despite the fact that the articles relied upon by the plaintiffs state the very opposite. The first article was published by the World Health Organization, in 2009, stating that there is insufficient evidence of a causal relationship between indoor dampness-related agents and health outcomes. World Health Organization Indoor Air Quality Guidelines, World Health Organization, 71 (2009) attached attached to Memorandum as Exhibit J. It is quite surprising that plaintiffs' cited the WHO Guidelines because it states that there is no causal link, supporting the defendants' position. Specifically, it provides that "[f]or one health outcome, asthma

4

exacerbation, we consider the evidence to be sufficient to document an association and <u>almost</u> sufficient to document causality of dampness-related factors." WHO at pages 70-71 attached to plaintiffs' Memorandum in Opposition as Exhibit 13 (emphasis added). However, the article does not go to the necessary level of actual causation, but stopping short at merely an association. The article clearly states that there is no causal relation between mold and asthma exacerbation, upper respiratory tract symptoms, cough, wheeze, asthma development, dyspnoea, and current respiratory infections. <u>Id</u>. at 71. As previously cited, this Court is not bound by the improper conclusions that the plaintiffs draw from quoted literature. <u>See</u> <u>Hendrix,</u> 609 F.3d at 1199.

"Association" is defined as "in clinical epidemiology, the relationship of the occurrence of two events, without evidence that the event being investigated actually causes the second condition." <u>See</u> TABER'S CYCLOPEDIC MEDICAL DICTIONARY 178 (19th ed. 2001). For instance, malaria occurs in warm climates with proper breeding conditions for certain types of mosquitoes, but those conditions are associations. <u>Id</u>. The actual cause of malaria is the parasite, not the warm climate. The analogy can be applied to mold. Mold is associated with certain symptoms, but it is not the cause. <u>See</u> WHO at page 70-71.

Another article offered by the plaintiffs was published by the Institute of Medicine ("IOM"), which similarly concludes that there is insufficient evidence of a causal relation between health outcome and exposure to mold or other agents in damp indoor environments. Institute of Medicine of the National Academies, <u>Damp Indoor Spaces</u>, 8-9 (2004) attached to Memorandum as Exhibit I. Again, the current science can only show that there is an association, not causation. <u>Id</u>.

Plaintiffs also rely upon the Center for Disease Control ("CDC") report to prove causation. See Exhibit 12 to Brief in Opposition. It should be noted that the CDC commissioned the IOM to perform a comprehensive review of the scientific literature in this area. Id. at page 16. The CDC found that, at the time of its published report, the IOM's report, Damp Indoor Spaces, was the most current and authoritative source of information pertaining to mold and adverse health conditions. Id. Despite plaintiffs' references to a number of excerpts, the CDC stated "[n]o conditions exists (sic) for which the IOM found sufficient evidence of a causal relation with mold or with damp indoor spaces." Id. at 17.

In short, plaintiffs attempt to bury the lack of causal connection in a patchwork of quotes that are taken out of context. That context is the absence of causal connection. Yet, plaintiffs cite to these articles searching for support of their theory despite the literature reaching an opposite conclusion.

### III. Dr. Lipsey is Unqualified to Offer a Medical Opinion and He Speculates as to the Presence of VOCs, Mycotoxins, and Heavy Mold

In plaintiffs' memorandum in opposition, they contend that Dr. Lipsey is qualified to offer a causation opinion even though Dr. Lipsey acknowledges that he is not giving a medical opinion. Regardless of the opinion's characterization, Dr. Lipsey is, in actuality, offering a medical opinion for which he is not qualified to render. The case at hand is similar to that in Leija v. Penn Mar., Inc. where the court excluded a toxicologist, who was not a medical doctor, for offering a medical causation opinion. 2009 U.S. Dist. LEXIS 8539, 7 (E.D. La. Jan. 23, 2009). In particular, the court ruled that the toxicologist was unqualified to opine whether workplace exposure to toxic substances, more likely than not, caused the plaintiff's cancer. Id. A number of jurisdictions have reached similar conclusions, including one district court in the Fourth Circuit. See also Plourde v. Gladstone, 190 F. Supp. 2d 708 (D. Vt. 2002)(excluding

6

industrial hygienist and toxicologist because not qualified to offer medical opinion on causation); Goewey v. United States, 886 F. Supp. 1268 (D.S.C. 1995). Therefore, Dr. Lipsey's medical causation opinion, regardless of how it is characterized, must be excluded.

Plaintiffs contend that the defendants only challenge Dr. Lipsey for his lack of qualifications as a medical doctor and do not dispute his testimony about what symptoms and adverse health effects arise from exposure to mold. This statement is incorrect. Defendants certainly object to all of this testimony as Dr. Lipsey is not a medical doctor.

Next, plaintiffs argue that both mycotoxins and VOCs were present in the home. To support Dr. Lipsey's belief that mycotoxins were in the home, he relies only upon scientific literature and his experience. His experience can summarly be dismissed as unreliable because he admitted that (i) there was no proof of the conditions in the home that enables mycotoxins to be present, (ii) there was no testing of the house to determine the existence of mycotoxins, (iii) there was no evidence to determine whether the plaintiffs were exposed to mycotoxins, (iv) his self-created guidelines have not been published, (v) his guidelines had not been peer-reviewed. Dr. Lipsey Depo. at 31:17-22; 32:19-25 – 33:1-3, 35:21-25 – 36:1-6, 40:2-10 attached as Exhibit B to Memorandum. Dr. Lipsey reaches this conclusion with no proof other than he suspects that mycotoxins would be present. To render an opinion about the presence of mycotoxins here is a classic example of "because the expert says so." Such opinions should be outright excluded. General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). "[I]t still is a requirement that the expert opinion evidence be connected to existing data by something more than the 'it is so because I say it is so' of the expert." Holesapple v. Barrett, 5 Fed. Appx. 177, 2001 U.S. App. LEXIS 3128 (4th Cir. Md. 2001).

As for the scientific literature, plaintiffs inundate this Court with a number of articles that only state that mold can, or have the ability to, produce mycotoxins. If Dr. Lipsey is to rely upon the literature alone, he must be able to demonstrate that Stachybortys, or any mold for that matter, always produces mycotoxins. Otherwise, the jury would be left to speculate whether or not this is an environment where mycotoxins have the ability to be produced. He must be able to show that molds always produce mycotoxins because there is no clinical proof or testing to confirm their presence. The plaintiffs first point to Mold Remediation in Schools and Commercial Buildings that says that "molds can produce toxic substances called mycotoxins. . . ." See Environmental Protection Agency ("EPA") page 41 attached to Memorandum in Opposition as Exhibit 5. But the article does not go beyond the possibility of producing mycotoxins to the necessary realm of "always." The article further provides that "[s]ome molds can produce several toxins, and some molds produce mycotoxins only under certain environmental conditions. The presence of mold in a building does not necessarily mean that mycotoxins are present or that they are present in large quantities." Id. at 42. Further, Stachybotrys is known to produce toxins under certain circumstances. Id.

In addition, the plaintiffs cite to the Institute of Inspection, Cleaning and Restoration Certification for the same conclusion that Stachybotrys has the ability to produce mycotoxins. See Standard and Reference Guide for Professional Mold Remediation, (1st Ed. 2003) attached to plaintiffs Memorandum in Opposition as Exhibit 6. However, the article states quite the opposite. "Stachybotrys chartarum . . . are also capable of producing a class of compounds known as mycotoxins. . . Mycotoxin production does not always occur and is dependent upon the physiology and genetics of the organism, as well as the amount of moisture, light and temperature. Id. at 44 (emphasis added). Dr. Lipsey stated that he is unaware if any of the

conditions were present for mycotoxins to be present. Dr. Lipsey Depo. at 31:17-22; 32:19-25 – 33:1-3. As a result, Dr. Lipsey makes a speculative leap to opine that the presence of Stachybotrys means that mycotoxins are automatically produced and present in the home. For this reason, his opinion regarding the presence of mycotoxins should be excluded.

Similarly, the plaintiffs point to an opinion by Dr. Lipsey that VOCs are present in the home. Again, the absence of any clinical proof or verified testing renders his opinion unreliable. Yet, he claims that VOCs are present in the home, absent any testing, because (i) VOCs are always present with mold and (ii) the plaintiffs' parents detected a musty odor. Just like mycotoxins, the plaintiffs cannot produce any literature that states that mold <u>always</u> produces VOCs or that VOCs are <u>always</u> present when someone detects a musty smell. The literature offered by the plaintiffs merely states that "these compounds . . . <u>can</u> be the source of odors associated with molds." <u>See</u> EPA at 43 (emphasis added). Here again, the literature does not state that whenever there is an odor, you <u>always</u> have the presence of VOCs. It only suggests that it is possible, which is nothing more than speculation. Defendants are unaware of any such literature to the contrary and without it, Dr. Lipsey's opinion regarding the presence of VOCs in the home is speculative.

Dr. Lipsey also states that there were "heavy" quantities of mold in the home. He relies upon and essentially reiterates what is stated in the Sci-Labs report. Dr. Lipsey is quoting another expert's opinion. An expert is not entitled to testify to opinions that rely on the opinion of another expert, simply because the other is an expert. <u>See</u> <u>TK-7 Corp. v. Estate of Barbouti</u>, 993 F.2d 722, 732 (10th Cir. 1993) (expert who adopted the projections of another expert did not reasonably rely on those projections when "he knew little or nothing at all about" the other expert and the record did not reveal what efforts the expert independently made to corroborate

the projections). It is undisputed that he did no testing of the home himself. Moreover, there is no published quantitative or qualitative level that can be surpassed for mold to be considered "heavy." Without any standards, any hired gun can reach a conclusion that even the slightest hint of mold is "heavy" despite the fact that mold is ubiquitous. His opinion is unfounded, unreliable, highly prejudicial and misleading. It should also be noted, contrary to plaintiffs' assertion, that a representative from Sci-Labs has not been designated as an expert.

## IV. Dr. Frye's Causation Opinion is Purely Speculative

Plaintiffs contend that Dr. Frye's opinion is a debate among experts and should not be considered upon a Daubert motion. The ruling in Daubert charges trial judges with the responsibility to act as "gatekeepers" to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." Daubert, 509 U.S. at 589. Whether Dr. Frye is offering an opinion grounded upon guesswork needs to be addressed before presented to the jury. Whether her opinion is well grounded in fact and whether she can state that mold caused the plaintiffs' injuries are issues that sound in reliability.

Regardless of the weaknesses of her opinion brought out in cross-examination, Dr. Frye's own carefully selected wording in her letter dated May 6, 2002 screams of speculation. See Dr. Frye Letter attached to Memorandum as Exhibit N. Therein, she stated that "[the plaintiffs] have had multiple illnesses throughout this year possibly related to the [mold]." Id. Obviously, she chose to use the word "possibly" at a time when there was no pending litigation, no line of questioning, and closer in time to her evaluation of the children. She could have stated "probably" or even chose to omit "possibly" altogether. Neither alternative route was chosen. Therefore, the only conclusion that can be reasonably drawn is that Dr. Frye, who admits she is

10

not a mold expert, was unsure whether mold caused the plaintiffs' injuries. See Frye Depo. at 11:7-9 attached to Memorandum as Exhibit M.

In the plaintiffs brief, they argue that Dr. Frye's causation opinion should survive scrutiny because she relied upon infectious disease manuals and medical literature and matched the symptoms with the mother's oral report of mold (as part of the medical history). Yet, Dr. Frye has not offered the specific citations or quotes that she relied upon at the time she made her diagnosis. Without this evidence to support her opinion, the Court is left to assume whether or not that these texts fully supported her theory. Like the other passages quoted by the plaintiffs, we should not simply take their word for it. The recitation of works by counsel is insufficient because Dr. Frye neither stated that she relied upon that literature nor that they were authoritative on the subject of mold at the time of her diagnosis.

Dr. Frye's opinion, in actuality, is only predicated upon the mother's report of mold in the home. It goes without saying that the plaintiffs' mother is biased. This is purely a case of blind faith that that the Court cannot find reliable. Dr. Frye <u>never</u> saw any proof that mold was in the home. Dr. Frye Depo. at 21:15-22 attached to Memorandum as Exhibit M. She does <u>not</u> recall seeing any mold testing. <u>Id</u>. After acknowledging that mold is ubiquitous, how can Dr. Frye reliably reach the conclusion that the plaintiffs were exposed to harmful levels of mold in the home. <u>See id</u>. At 22:13-15. Dr. Frye failed to consider generally accepted factors in reaching a causation opinion, such as timing, duration, exposure or dose in relationship to the mold. These missing foundational blocks cannot support the heavy weight of such an opinion.

**V.**      **<u>Dr. Elgort's is Unqualified to Offer a Medical Opinion and his Opinion Diagnosis is Irrelevant</u>**

Plaintiffs offer Dr. Elgort to testify that he diagnosed K.K. with an adjustment disorder and that the disorder was in place when he last saw her in 2008. <u>See</u> page 40 of the Plaintiffs'

Memorandum in Opposition. Dr. Elgort is a licensed clinical psychologist, not a "treating doctor" as represented by the plaintiffs. Although Dr. Elgort is not a medical doctor, plaintiffs urge this Court to allow him to offer a diagnosis opinion. Although couched by plaintiffs as a factual observation, Dr. Elgort's testimony goes beyond that of mere observation. He diagnoses K.K. with an adjustment disorder.

Contrary to plaintiffs' assertion, it has been held that a treating physician's testimony about a patient's diagnosis constitutes medical opinion testimony. Ingram v. ABC Supply Company, Inc. 2010 WL 233859 (D.S.C.). In Ingram, the court considered whether the plaintiffs could timely cure the defect in their expert designation for not disclosing the treating physicians as experts or their respective opinions.[1] Id. The court ruled that a treating physicians' testimony about a patient's diagnosis, prognosis, and future medical care is medical opinion testimony that falls under Rule 26(a)(2)(A)'s expert disclosure requirement. Id. at 2. Any testimony about a patient's diagnosis, prognosis and future medical treatments falls within Rule 702 because such testimony is based on the physicians' "scientific, technical, or other specialized knowledge." Id. at 3. Quite clearly, diagnosis of an adjustment disorder is not a factual observation, but a diagnosis opinion.

To offer this opinion, a medical doctor must offer the opinion. See Cooper v. Smith & Nephew, Inc. 259 F.3d 194, 198 (4th Cir. 2001); John v. Im, 263 Va. 315, 321, 559 S.E.2d 694, 697; Estate of Hezekiah Harvey v. Roanoke City Sheriff's Office, 585 F. Supp. 2d 844 (W.D. Va. 2008); Goodwin v. MTD Products, Inc., 232 F.3d 600 (7th Cir. 2000). Once it is established

---

[1] Defendants moved to exclude the opinion of Dr. Elgort because the plaintiffs did not comply with Rule 26(a)(2)(C) by providing (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify. See Motion to Exclude (Docket # 59). Agreeing with our position, this Court, by Order dated June 3, 2011 (Docket # 91), ordered that the plaintiffs must properly designate Dr. Elgort and comply with Rule 26(a)(2)(C).

that a medical doctor is needed to render this opinion, the plaintiffs appear to concede that Dr. Elgort is not qualified as a medical expert to offer this opinion. See page 38-39 of Memorandum in Opposition.

Not only is Dr. Elgort unqualified, but also the diagnosis of K.K. is irrelevant to the case at hand. The plaintiffs' failed to address this point in their brief. The only conclusion to be drawn from such an omission is that Dr. Elgort cannot pass a Daubert analysis. As previously indicated, Dr. Elgort said that his "work had nothing to do with medical issues resulting from mold toxicity" and that mold was mentioned only "in passing." Dr. Elgort Depo. at 12:17-18, 13:12-13 attached to Defendants' Memorandum as Exhibit O. Any adjustment and psychological issues, according to Dr. Elgort, stem from the divorce and not the alleged mold exposure. To withstand a Daubert challenge, Dr. Elgort's opinion must "fit" the case. It falls well short.

WHEREFORE, the defendants respectfully request that this Court enter an Order to

(i) Exclude the expert opinions of Dr. Leonard Vance, Dr. Joseph Vilseck, Dr. Richard Lipsey, Dr. Elizabeth Frye, and Dr. Andrew Elgort; and

(ii) for such other and further relief as this Court deems appropriate.

Respectfully submitted,

WILLIAM DAVID SPOTNITZ
DENISE CONSTANCE SCHAIN

By   s/ Chad A. Mooney
        Counsel

G. Edgar Dawson, III
VSB #: 21666
Chad A. Mooney

13

VSB #: 75211
**PETTY, LIVINGSTON,
DAWSON & RICHARDS**
725 Church Street, Suite 1200
P.O. Box 1080
Lynchburg, VA  24505
(434) 846-2768 (telephone)
(434) 847-0141 (facsimile)
edawson@pldrlaw.com
cmooney@pldrlaw.com

**CERTIFICATE OF SERVICE**

       I, Chad A. Mooney, do hereby certify that the foregoing **Defendants' Reply to Plaintiffs' Memorandum in Opposition to Motion in Limine to Exclude Plaintiffs' Experts** was sent using the CM/ECF system which will send notification of such filing to David Bailey, counsel for plaintiff, on this 9th day of August, 2011.

                                                    s/ Chad A. Mooney
                                                      Chad A. Mooney